**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| ROBERT DINKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:09-cv-04111-NKL |
| | ) | |
| CORRECTIONAL MEDICAL | ) | |
| SERVICES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Plaintiff Robert Dinkins filed this lawsuit against Correctional Medical Services, John Doe Medical Doctors, the State of Missouri, the Missouri Department of Corrections (MDOC), and Jefferson City Correctional Center (JCCC) officers Phillip Lange and Morris Logan alleging violations of Title II of the Americans with Disabilities Act (ADA) and section 504 of the Rehabilitation Act of 1973 (RA). Before the Court is the State of Missouri and MDOC's Motion for Summary Judgment, [Doc. 197]. For the reasons set forth below, the Motion is granted in part and denied in part. The Motion for Summary Judgment as to Dinkins' physical therapy claims is granted. The Motion for Summary Judgment as to Dinkins' housing and meal claims is denied.

**I.      Procedural History**

This lawsuit was filed in June 2009. The Court granted Dinkins leave to file a Second Amended Complaint in June 2010, which seeks injunctive relief and compensatory and punitive damages arising out of alleged violations of the ADA and RA. [Doc. 33-1]. In August 2010, Defendants the State of Missouri, MDOC, and officers Lange and Logan filed a Motion to

1

Dismiss, [Doc. 47]. These defendants argued that the claims against them should be dismissed because (1) correctional officers Lange and Logan may not be sued in their individual capacities under Title II of the ADA; (2) the defendants were entitled to Eleventh Amendment immunity; and because (3) Dinkins' claims were based on medical treatment decisions, which are not actionable under the ADA or RA. [Docs. 47 & 54]. The Court granted the Motion to Dismiss for those reasons. [Doc. 60]. In April 2011, the sole remaining named Defendant, Corizon Medical Services, filed a Motion to Dismiss, [Doc. 100]. The Court granted its Motion to Dismiss because Dinkins' claims against it were based on medical treatment decisions, and claims under the ADA or RA cannot be based on medical treatment decisions. [Doc. 118].

Dinkins appealed the Court's dismissal of his claims against all defendants. The Eighth Circuit affirmed dismissal of the individual capacity claims against Lange and Logan because they could not be sued in their individual capacities under the ADA or RA. *See Dinkins v. Corr. Med. Servs.*, 743 F.3d 633, 634 (8th Cir. 2014). The Eighth Circuit also affirmed dismissal of the claims against the John Doe Medical Doctors and Corizon Medical Services because those claims were based on medical treatment decisions. *Id.* However, the Eighth Circuit concluded that not all of Dinkins' claims against Lange and Logan (in their official capacities), the State of Missouri, and MDOC appeared to be based on medical treatment decisions. Pointing to allegations that he was denied meals and adequate housing by reason of his disability and denied prescribed physical therapy, the Eighth Circuit stated that some of Dinkins' allegations could form the basis of viable ADA and RA claims. *Id.* at 635. The Eighth Circuit reversed the dismissal of Dinkins' claims for injunctive relief against the state defendants that were not based on medical treatment decisions. *Id.* The Eighth Circuit also reversed dismissal of Dinkins' damages claims against the State of Missouri and MDOC under the ADA and against the MDOC

2

under the RA because some of their alleged behavior could violate the Eighth and Fourteenth Amendments. *Id.* The Eighth Circuit stated that the MDOC waived sovereign immunity under the RA by accepting federal funds, and Title II of the ADA abrogates both the State of Missouri's and MDOC's immunity for conduct that actually violates the Fourteenth Amendment. *Id.* The case was remanded to this Court for further proceedings. *Id.*

On remand, the remaining defendants – Lange and Logan, the State of Missouri, and MDOC – filed a Motion to Dismiss All Claims for Injunctive Relief, [Doc. 142]. Their Motion was granted because Dinkins was transferred to Pickneyville Correctional Center in Illinois – meaning that Dinkins was no longer in the custody of MDOC and subject to its control – and therefore, Dinkins' injunctive relief claims were moot. [Doc. 150] (citing *Randolph v. Rodgers*, 253 F.3d 342, 345-46 (8th Cir. 2001)). The only remaining claims in this lawsuit are Dinkins' ADA damages claims against the State of Missouri and MDOC and Dinkins' RA damages claims against MDOC.

In November 2014, the State of Missouri and MDOC (hereinafter Defendants) filed a Motion for Summary Judgment on Dinkins' remaining damages claims against them. [Doc. 197]. In January 2015, Dinkins retained counsel, Mr. MacArthur Moten, who responded to the Motion for Summary Judgment on behalf of Dinkins [Docs. 208, 209].

## II. Uncontroverted Material Facts[1]

---

[1] In response to Defendants' Motion for Summary Judgment, Dinkins stated in part that he could not reply to Paragraphs 48-56 of Defendants' Supplemental Statement of Uncontroverted Material Facts, [Doc. 202], because his attorney, Mr. Moten, did not have access to Defendants' Exhibit N, [Doc. 209], which was filed under seal and referenced in those Paragraphs. After determining that Mr. Moten was now in possession of the sealed exhibit, the Court gave Dinkins additional time to file a surreply responding to Paragraphs 48-56. [Doc. 223]. The Court informed Dinkins that if a surreply addressing those Paragraphs was not filed by March 12, 2015, the Court would treat those Paragraphs as uncontroverted. No surreply was filed, and so the Court will treat Paragraphs 48-56 of Defendants' Supplemental Statement of Uncontroverted Material Facts as uncontroverted.

Plaintiff Robert Dinkins was incarcerated at JCCC, an institution under the direction of MDOC, from 2004 until 2013. In 2004, Dinkins began experiencing symptoms of anemia and was diagnosed with anemia in December 2004 after collapsing during recreational time. In January 2006, after the symptoms intensified, Dinkins was diagnosed with pernicious anemia. By April 2006, Dinkins was paralyzed from the waist down. He was prescribed daily B-12 and iron treatments, a supplemental health drink, and a wheelchair.

Dinkins filed numerous grievances and requests related to physical therapy from 2006 through 2013. His requests were often denied, with JCCC medical professionals concluding that therapy was not medically necessary. In February 2006, an outside specialist recommended physical therapy. In May 2006, a physical therapist suggested anodyne infrared therapy. This recommendation was reviewed by the regional medical director at JCCC, a contracted medical professional who serves as the responsible physician for the facility. The regional medical director denied the anodyne infrared therapy recommendation after concluding that given Dinkins' condition and current B-12 treatments, anodyne infrared therapy was not medically necessary at that time.

On May 22, 2007, an outside specialist prescribed physical therapy, which was to occur 2-3 times per week for 4-6 weeks. Dinkins was transported to an outside clinic for physical therapy on May 30th and June 3rd, but after June 3rd, citing a disruption caused by Dinkins while at the clinic, the outside clinic refused to treat him and asked that he not return. On June 6th, a JCCC physician scheduled Dinkins for twice weekly physical therapy exercises in his cell in lieu of sessions at the outside clinic where Dinkins was no longer welcome. These exercises were based off of exercises provided by the outside clinic and were to be observed by JCCC

4

medical staff. JCCC medical staff regularly witnessed Dinkins perform the exercises in his cell. A JCCC physician ordered Dinkins to continue with these exercises throughout 2007 and 2008.

While incarcerated at JCCC, on several different occasions for a duration of several days to weeks, Dinkins was assigned to various levels of administrative segregation referred to as "strip cell status," "8 house," and the "boom boom room." In "strip cell status," an offender is stripped of his clothing and possessions as punishment for behavior such as threatening an officer. "8 house" is a long-term administrative segregation unit. The "boom boom room" is a rubber cell meant to prevent an inmate from harming himself. In each of these levels of administrative segregation, Dinkins was denied access to his wheelchair. His meals were delivered through an opening in his door called the "chuckhole."

Dinkins filed several written grievances and made oral complaints to various JCCC officials about his living conditions while in administrative segregation without his wheelchair. He complained that without his wheelchair, he was forced to crawl on the floor, eat his food off the floor, and sit in his own urine. He also complained that the shower facilities were not handicap accessible and that he fell in the shower and could not wash himself thoroughly. Dinkins requested access to a handicap shower, assignment to the JCCC infirmary, and the return of his wheelchair. Defendants deny that Dinkins was forced to crawl on the floor to access his meals, forced to eat on the floor, or forced to eliminate bodily waste on the floor. They also deny that Dinkins was not provided assistance in showering and using the restroom.

## III.    Discussion

Dinkins alleges that Defendants violated Title II of the ADA and section 794 of the RA by denying him access to showers, meals, prescribed physical therapy, and adequate housing by reason of his disability. Title II of the ADA states that "no qualified individual with a disability

shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132. The Supreme Court of the United States has held that state prisons fall squarely within the statutory definition of a "public entity" and that recreational activities, medical services, and educational and vocational programs provided by prisons to inmates are "services, programs, or activities" under the statute. *Pennsylvania Dept. of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *see also Jaros v. Illinois Dept. of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012) (stating that meals and showers made available to inmates are "program[s] or activit[ies]"); *Kiman v. New Hampshire Dept. of Corr.*, 451 F.3d 274, 287-88 (1st Cir. 2006) (stating that disabled inmate presented admissible evidence that corrections officers prevented him from using shower chair). Similar to the ADA, section 794(a) of the RA states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. 794(a). The Eighth Circuit has held that "[t]he ADA and the RA are similar in substance and, with the exception of the RA's federal funding requirement, cases interpreting either are applicable and interchangeable." *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (internal quotations omitted).

To establish a claim under the ADA, a plaintiff must show: (1) he is a person with a disability as defined by statute; (2) he is otherwise qualified for the benefit in question; and (3) he was excluded from the benefit due to discrimination based upon disability. *Id.* The elements to establish an RA claim are the same, except that under the RA, a plaintiff must additionally

6

show that the program or activity from which he was excluded receives federal financial assistance. *Id.*

For the purposes of their Motion for Summary Judgment, Defendants do not dispute that Dinkins is a person with a disability as defined by statute who is qualified for the benefits he alleges were denied. [Doc. 198, p. 8]. The sole issue, then, is whether any genuine issue of material fact exists regarding whether Dinkins was excluded from benefits due to discrimination based upon disability. Defendants argue summary judgment is appropriate on both the ADA and RA claims because there is no genuine issue of material fact regarding whether Dinkins received the benefits he claims to have been denied or excluded from receiving – meals, adequate housing, and medically prescribed physical therapy.

### A. Access to Meals

Dinkins alleges that while in "strip cell status," "8 house," and the "boom boom room," his wheelchair was taken away from him and that as a result, he was denied meals because he could not move across the cell to receive his meals through the "chuckhole." Defendants contend that Dinkins cannot establish that he was refused adequate meals because of his disability because Dinkins' Individual Confinement Record "clearly evidences that he was provided meals while housed in administrative segregation." [Doc. 203, p. 3]. However, while Dinkins admits that his Confinement Record shows that meals were delivered to him through the "chuckhole" in his cell door, a genuine issue of material fact exists because Dinkins testified under oath at his deposition that he was not always able to reach the meals placed in the "chuckhole" because he was paralyzed and did not have access to his wheelchair while in various levels of administrative segregation. [Doc. 197-1, p. 73:17-22; 96:11-21; 108:16-109:13]. In fact, the Individual Confinement Record relied upon by Defendants show several

instances where Dinkins "refused" meals, but it is unclear from these records whether he actually refused the meal or a correctional officer assumed he was refusing the meal because he could not reach them. It is also unclear from the Confinement Record whether the delivered meal trays were actually eaten or touched by Dinkins when they were later picked up. The Parties dispute whether Dinkins actually could not reach the meals or simply refused them, and this is a genuine issue of material fact. *See* [Doc. 209, p. 12, ¶ 19]; [Doc. 220, p. 5, ¶ 19]. Simply delivering the meals to an area Dinkins could not reach is not enough. "[T]he ADA and RA require that otherwise qualified individuals receive meaningful access to programs and activities" not just limited access. *Randolph*, 170 F.3d at 858 (concluding that the record did not contain credible evidence to support a finding that hearing impaired inmate enjoyed meaningful access to the prison's disciplinary process because although he could physically attend disciplinary hearings, his requests for a sign language interpreter had been denied).

Defendants also contend that Dinkins' claim that he was denied meals because his wheelchair was taken away must fail because Dinkins admits that when assigned to "strip cell status," "8 house," and the "boom boom room," assistive devices such as wheelchairs may be removed due to safety and security under MDOC policy. But even assuming that "safety and security" reasons existed to justify the removal of Dinkins' wheelchair, Defendants do not explain why this policy alone justifies denial of benefits provided to other non-disabled inmates. For example, when non-disabled inmates are stripped of their clothes or possessions and placed in administrative segregation according to MDOC policy, they are still able to access meals, unlike Dinkins, who says he was denied the only means of independently accessing his meals – his wheelchair. This is not to say that Dinkins was entitled to his wheelchair at all times, but

Case 2:09-cv-04111-MJW   Document 230   Filed 05/04/15   Page 8 of 21

when it was denied, he was entitled to a reasonable accommodation so that he could access meals provided by the prison.

One such accommodation Dinkins requested was that meals be brought him inside his cell rather than placed in the "chuckhole" for him to retrieve. Defendants argue that Dinkins has provided no evidence that he made any MDOC official aware that he was unable to reach meal trays placed in his cell door. This argument was made for the first time in Defendants' Reply brief, and there are no facts addressing notice in Defendants' Statement of Facts or Supplemental Statement of Facts, so Dinkins has not had an opportunity to respond to this argument. Nonetheless, a review of the record reveals that Dinkins testified that he made multiple verbal and written requests to the warden, correctional officers, and medical staff. [Doc. 197-1, p. 73:10-74:2]. This testimony is supported by a November 2007 Offender Grievance Response signed by the Health Service Administrator and Medical Director, which states that Dinkins made a complaint in October 2007 that he was "denied a wheelchair in the cell with [him] and that [he was] required to crawl around on and eat on the floor." [Doc. 197-11, p. 5]. Without indicating any kind of investigation, the response states, "[t]here is no need for you to crawl or eat on the floor." *Id.* Defendants also argue that the only formal "Request for Reasonable Accommodations" form submitted by Dinkins made no mention of needing his meals brought into his cell or missing meals due to lack of mobility. However, on the "Request for Reasonable Accommodations" form, Dinkins checked a box requesting "Dorm Proximity to Meals" due to a physical impairment. [Doc. 202-6].[2] Based on this evidence and Dinkins' deposition testimony,

---

[2] In his Statement of Additional Material Facts, Dinkins references a separate lawsuit filed against JCCC, various correctional officers, and Corizon Medical Services. See Case No. 2:06-cv-04303-NKL. In that lawsuit, Dinkins filed a "Motion for Temporary Restraining Order [and] Permanent Injunction Under Imminent Danger," where he claimed that while in administrative segregation, his wheelchair was removed and he was unable to receive meals, medications, and toilet facilities. [Doc. 12, p. 1]. He also stated that he was unable to relieve himself and that he was told to crawl on the floor to get his meals. *Id.* He asked that his wheelchair be returned. A hearing was held by the Hon. William A. Knox, and the court ordered MDOC to give Dinkins a wheelchair. [Doc. 15]. Regardless of

9

a reasonable juror could conclude that the MDOC had notice of Dinkins' inability to reach food placed in the "chuckhole."

Defendants also argue for the first time in their Reply that "due to heightened security concerns, it is not a reasonable accommodation in the administrative segregation unit to have an offender's meals brought into his cell." [Doc. 220, p. 9]. "While a public entity is required to make reasonable accommodations where necessary to give 'meaningful access' to programs or benefits, the entity need not make available auxiliary aids and services if it can show that to do so would be 'unduly burdensome.'" *Mason v. Corr. Med. Servs., Inc.*, 559 F.3d 880, 886 (8th Cir. 2009) (internal citations omitted). Even assuming that delivering meals into Dinkins' cell when he could not otherwise reach them is an "auxiliary service" and not one of basic necessity, Defendants are not entitled to summary judgment because whether a requested accommodation is "unduly burdensome," and therefore, unreasonable, is normally a question for the fact-finder. *See Randolph*, 170 F.3d at 859 (reversing the district court's decision granting an inmate's motion for summary judgment because the MDOC presented substantial evidence that the inmate's request created safety and security issues, and the MDOC was entitled to have its evidence considered by the fact-finder). Defendants cite to the MDOC's policy that correctional officers are required to secure an offender inside an administrative segregation unit before opening the cell door, but Defendants do not explain why this requirement would prevent them from delivering meals to Dinkins once he was restrained.

**B. Access to Adequate Housing and Showers**

Dinkins alleges multiple reasons why he was denied adequate housing due to his disability while in both administrative segregation and general population at JCCC.

---

whether his allegations are true – a question for the jury – this separate lawsuit against JCCC is further support that Dinkins made JCCC aware of his living conditions while in administrative segregation as early as December 2006, when he filed the lawsuit.

### 1. Denial of Request for Assignment to Infirmary

Dinkins alleges he was denied adequate housing because his requests to be assigned to the infirmary unit were denied. Dinkins alleges that he should have been assigned to the infirmary "as required by his M-5 status." [Doc. 33-1, p. 16, ¶ 36]. However, Dinkins admits that admission to the infirmary unit is predicated upon the order of a licensed physician and that MDOC relied on the independent medical determinations of licensed medical providers when assessing appropriate medical care. Dinkins has not pointed to any evidence suggesting that a licensed physician prescribed or recommended assignment to the infirmary or that MDOC employees ignored such an order. Even if "M-5 status" classification means he was supposed to be in the infirmary unit, Dinkins does not point to any evidence suggesting he had an "M-5 status" classification. To the extent Dinkins is alleging that a physician should have assigned him to the infirmary, that decision is a medical decision which cannot form the basis of a claim under the ADA or RA. *See Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005) (per curiam).

### 2. Assault in General Population

Dinkins also alleges that because his request to be assigned to the infirmary was denied, he was assaulted by inmates in general population and could not defend himself because he was disabled. Defendants do not argue whether Dinkins' assault allegation is actionable under the ADA or the RA. Instead, Defendants argue that the "evidence cited in Plaintiff's Suggestions in Opposition does not support Dinkins' new allegation that he was a victim of any assault." [Doc. 220, p. 10]. First, Dinkins' allegation of assault is not a "new" allegation. Dinkins alleged in his Second Amended Complaint that he was placed in non-handicap cells, "resulting in prisoner assault." [Doc. 33-1, p. 11, ¶ 28]. He also alleged that he was assaulted by other prisoners,

11

which could have been prevented by assignment to the infirmary. *Id.* at p. 10, ¶ 23. Second, contrary to Defendants' argument, Dinkins' allegation that he was victim of assault is supported by the evidence he cited. In his Suggestions in Opposition, Dinkins states that he was a victim of assault and cites to page 122, lines 1-24 of his deposition. On page 122 of his deposition, Dinkins testified under oath that he asked wardens, "medicals," doctors, nurses, and "everybody that I could think of" "so many times" for a transfer to the infirmary because it was a safer environment. [Doc. 197-1, p. 122:5-123:5]. He also testified that he gave the names of other inmates he feared. *Id.* at p. 124:24-125:18. Therefore, this is an issue for a jury.

### 3. Access to Showers

Dinkins' allegations related to adequate shower access are two-fold. Dinkins alleges that while in "strip cell status," "8 house," and the "boom boom room," his wheelchair was removed and he could not travel to the shower. At his deposition, Dinkins testified that MDOC staff refused to bring his wheelchair to him or take him to the showers. [Doc. 197-1, p. 14:23-15:7; 15:22-16:4]. Correctional officers would not take him to the shower because without his wheelchair, he often could not make it to the "chuckhole" to be restrained. *Id.* at p. 37:9-15. Dinkins also alleges that even when he did have his wheelchair and was able to go to the showers, he was denied access to a handicap shower and was provided an inadequate chair in the shower, which was unsafe.

Defendants contest Dinkins' statement of fact that he was denied showers. This discrepancy in facts, alone, suggests a genuine issue of material fact. In the briefing in support of their Motion for Summary Judgment, Defendants do not specifically address Dinkins' allegations regarding his access to showers. Instead, Defendants argue that Dinkins did not submit a request for accommodation until August 2011 and that this request did not mention

showers. However, Defendants do not point to any MDOC policy or law requiring a disabled person to request accommodations only through the filing of a "Reasonable Request for Accommodations" form. *See Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 952 n. 5 (8th Cir. 1999) (stating in an ADA lawsuit in the employment context that "[a]lthough in this case [the plaintiff] made a written request and used the relevant words of 'reasonable accommodation' . . . an employee is not required to request accommodation in writing, or to use the magic words of 'reasonable accommodation.' The notice must merely make it clear to the employer that the employee wants assistance for his or her disability."). With that being said, Dinkins testified that MDOC employees "refused to come in the cell or bring a wheelchair and put me in a wheelchair or give me the wheelchair to push me to the showers." [Doc. 197-1, p. 15:22-16:2]. Dinkins also testified that he made requests from 2004 to 2013 for appropriate medical benches in the showers, but those requests were denied. *Id.* at p. 117:23-118:3. This testimony is supported by various complaints made by Dinkins. A complaint made in February 2006 states, "the hand[i]cap shower is broke in 3A, I need help when taking a shower because I cannot stand or wipe myself complet[e]ly." [Doc. 197-9, p. 16]. Dinkins filed a complaint in January 2008 stating that he was injured from an improper shower. [Doc. 197-8, p. 8]. The response to that complaint states: "Your IRR complaint alleges you are being kept in poor condition by the custody officers," but there is no statement regarding Dinkins' shower complaint. Another complaint was filed in February 2008. *Id.* at 6. In March 2008, the superintendent responded to the complaint and stated that Dinkins was being showered using the shower chair and was capable of pushing himself to the shower using his legs. *Id.* at 7. An "Offender Grievance Appeal" filed by Dinkins in April 2008 states that a correctional officer continues to force him to use the regular shower. *Id.* at 2. He also appears to state that the plastic

13

chair in the shower is inadequate, that he falls and injures himself, that it is very difficult to shower because he tips over, that he cannot wash himself thoroughly, and that he would like to use the handicap shower. *Id.* at 3. The response to Dinkins' grievance, dated in June 2008, acknowledges that Dinkins has requested assistance in showering, but does not indicate whether his request was granted. *Id.* at p. 5.[3]

There are genuine issues of material fact regarding whether Dinkins was denied the benefit of a safe shower due to his disability. Given the multiple grievances filed by Dinkins and his deposition testimony, a reasonable juror could conclude that the MDOC was on notice of Dinkins' request for shower accommodations and did not accommodate him, thereby denying him of a benefit on the basis of his disability.

### 4. Eating and Crawling on the Floor

Dinkins also alleges that while in "strip cell status," "8 house," and the "boom boom room," his wheelchair was taken away, and because he could not walk or stand without it, he was forced to eat and crawl on the floor and sit in his own urine. Like their argument regarding Dinkins' shower access allegations, Defendants contend that Dinkins did not submit a request for accommodation until August 2011 and that this request did not mention crawling on the floor. However, there are grievances filed by Dinkins regarding eating and crawling on the floor. For example, in July 2006, Dinkins stated in an "Offender Grievance Appeal" that when he was in "8 house," he was not allowed to have a wheelchair in his cell and that he "used the bathroom on [him]self, [and] couldn't wash [his] face or brush [his] teeth." [Doc. 197-9, p. 5]. In October 2007, Dinkins complained that he was placed in "strip cell status" without his wheelchair, that he had to crawl on the floor, and that he had to eat meals on the "filthy" floor. [Doc. 197-11, p. 4].[4]

---

[3] *See also supra*, note 2 for another complaint filed by Dinkins.
[4] *See also supra*, note 2 for another complaint filed by Dinkins.

From this evidence, a reasonable juror could conclude that Defendants knew about Dinkins'

housing conditions and requests for accommodations.

Defendants also focus their summary judgment argument on Dinkins' allegation that he

was denied assignment to the infirmary unit, arguing that the decision not to place Dinkins in the

infirmary unit was a medical decision not subject to an ADA or RA claim.  While it is true that

the denial of Dinkins' request to be assigned to the infirmary unit was a medical decision by a

licensed physician, and therefore, not subject to an ADA or RA claim, Defendants do not explain

how this denial alone also meant that the prison was not required to reasonably accommodate

Dinkins in other ways.

Defendants also argue that Dinkins was provided adequate housing because the prison

has ADA compliant cells.  However, Defendants do not state or provide any evidence that

Dinkins was assigned to a handicap cell.  Further, Dinkins' allegations largely relate to times he

spent in administrative segregation, and Defendants do not state whether, when in administrative

segregation, Dinkins was provided a handicap cell. Even if Dinkins was provided a handicap

cell, Defendants do no explain how this assignment alone would entitle them to summary

judgment since they concede that Dinkins' wheelchair was taken away from him while in

administrative segregation.  The crux of Dinkins' claims is that while in administrative

segregation, his wheelchair was removed and he was forced to crawl on the floor, sit in his own

urine, and miss showers and meals.  There are genuine issues of disputed material fact regarding

whether Dinkins was denied adequate housing based on his disability.  Therefore, summary

judgment on Dinkins' housing claims is denied.

**C.  Access to Medically Prescribed Physical Therapy**

Dinkins also alleges that Defendants violated the ADA and RA by denying him access to medically prescribed physical therapy. Summary judgment on this claim is appropriate because there is no genuine issue of material fact regarding whether Dinkins was provided physical therapy when prescribed. Initially, the Court notes that to the extent that Dinkins alleges physicians should have prescribed more or different physical therapy, a physician's decision not to do so is a medical decision and is not actionable under the ADA or RA. Dinkins also concedes that the decision to prescribe physical therapy for an offender is a decision made by a licensed medical professional and that MDOC relied on the determinations of those professionals. Dinkins claim, then, is limited to his allegation that he was prescribed physical therapy by a medical professional but that Defendants denied access to that therapy.

The Parties agree that Dinkins was prescribed physical therapy by a physician on May 22, 2007, and that the prescription was for therapy two to three times per week for four to six weeks. [Doc. 209, p. 3, ¶ 19]. The narrow question is whether Dinkins was provided this therapy for the four to six weeks following his May appointment. It is undisputed that on May 30, and June 3, 2007, Dinkins was taken to an outside clinic for physical therapy. It is also undisputed that the clinic, citing a disruption caused by Dinkins, refused to treat him after June 3rd. [Doc. 197-2, p. 4]. Dinkins admits that thereafter, on June 6, 2007, Dr. Rex Hardman, a physician employed by Corizon Medical Services at JCCC, scheduled Dinkins for twice weekly physical therapy exercises to be completed within his cell. These exercises were observed by medical staff and based off of exercise instructions provided by the outside clinic Dinkins first attended. Dinkins admits that the prison's medical staff regularly observed him performing the exercises in his cell.

16

Dinkins argues that the in-cell physical therapy was inadequate and was not comparable to outside treatment. He argues that "the denial of outside clinic physical therapy and inadequate in-cell program with his disability was essentially the denial of physical therapy." [Doc. 211, p. 9]. However, the record establishes that Dinkins was provided physical therapy as prescribed. Dinkins argues that he was denied "outside clinical physical therapy," but the prescription for physical therapy does not specifically require that the therapy be conducted at a facility outside of the prison. [Doc. 197-2, p. 2]. The physical therapy exercises he performed within his cell were exercises provided by the outside facility and were monitored by medical staff within the prison. Medical staff at the facility continued to recommend this therapy even after the six week period, suggesting that medical staff believed the treatment was adequate. Further, Dinkins does not explain how in-cell therapy exercises – once he was asked not to return to the outside clinic – were inadequate or not comparable to outside treatment. Dinkins also does not point to any opinion from a medical professional that his in-cell therapy was inadequate or any prescription requiring outside clinical care. There are no genuine issues of material fact regarding whether Dinkins was provided access to prescribed physical therapy. Therefore, summary judgment on this claim under the ADA and RA is granted.

## D. Eleventh Amendment Immunity

Defendants argue that even if there are genuine issues of material fact on Dinkins' claims, they are entitled to summary judgment on his ADA claims because, as a matter of law, they are entitled to immunity under the Eleventh Amendment. The Eighth Circuit has held in this case on appeal that "Title II of the ADA abrogates both the State of Missouri's and the MDOC's immunity for conduct that actually violates the Fourteenth Amendment" and that "some of [D]efendants' alleged behavior could violate the Eighth and Fourteenth Amendments."

17

*See Dinkins v. Corr. Med. Servs.*, 743 F.3d 633, 634 (8th Cir. 2014) (citing *United States v. Georgia*, 546 U.S. 151, 159 (2006)). Defendants argue that none of their actions violate the Fourteenth Amendment, and therefore, Title II of the ADA does not abrogate their immunity.

Dinkins alleges violations of both the Eighth and Fourteenth Amendments. *See, e.g.*, [Doc. 33-1, p. 16, ¶ 35; p. 21, ¶ 42]. The Fourteenth Amendment Due Process Clause incorporates the Eighth Amendment guarantee against cruel and unusual punishment. The Eighth Circuit has stated that

> [t]o prevail on an Eighth Amendment claim, an inmate must prove both an objective and a subjective element. First, the alleged deprivation, objectively, must be sufficiently serious; the prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities; or the prison official must incarcerate the inmate under conditions posing a substantial risk of serious harm. Second, the prison official, subjectively, must act with deliberate indifference to inmate health or safety.
>
> While it is true that constructive knowledge, or the "should-have-known" standard, is not sufficient to support a finding of deliberate indifference, it does not follow that the required element of subjective knowledge cannot be proved by evidence of surrounding circumstances. The question whether the official knew of the risk is subject to demonstration, like any other question of fact, by inference from circumstantial evidence. Therefore, if an inmate presents evidence of very obvious and blatant circumstances indicating that the prison official knew the risk existed, then, it is proper to infer that the official must have known.

*Simmons v. Cook*, 154 F.3d 805, 807 (8th Cir. 1998) (internal citations and quotations omitted). With this standard in mind, the Court concludes that if true, Defendants' conduct could violate the Eighth and Fourteenth Amendments. As to the objective element, Dinkins testified that he was denied meals, showers and adequate showering facilities when his wheelchair was taken away in various levels of administrative segregation. He also testified that he was forced to crawl on the floor, eat off the floor, and sit in his own urine. This evidence is sufficient to create

18

the inference that Dinkins was denied the "minimal civilized measure of life's necessities" and subjected to "conditions posing a substantial risk of serious harm." *Id.* at 807-08 (upholding damages award for Eighth Amendment violation where paraplegic inmates missed four consecutive meals because their wheelchairs could not maneuver to the door where the food tray was placed in maximum security cells and because they were unable to eliminate bodily waste because they were denied assistance); *Cummings v. Roberts*, 628 F.2d 1065, 1068 (8th Cir. 1980) (inmate with back injury who needed wheelchair stated claim for cruel and unusual punishment in violation of the Eighth Amendment where prison officials denied access to wheelchair, thereby forcing him to crawl on the floor, and refused to assist inmate clean himself); *LaFaut v. Smith*, 834 F.2d 389, (4th Cir. 1987) (prison official's failure to make toilet facilities accessible to inmate confined to wheelchair was a violation of the Eighth Amendment where inmate was forced to drag himself to the toilet and where inmate fell off toilet because of no rails); *Muhammad v. New Jersey Dept. of Corr.*, 645 F.Supp.2d 299, 317 (D.N.J. 2008) (plaintiff with prosthetic leg allegedly suffered deprivation "sufficiently serious" to violate Eighth Amendment when cell transfer made it difficult for him to reach handicap shower and where he could not safely shower in regular shower); *Casey v. Lewis*, 834 F.Supp. 1569 (D. Ariz. 1993) (prison that lacked accessible bathrooms, showers, and cells, causing disabled inmates to fall, violated inmates' Eighth Amendment right to the basic necessities of life).

As to the subjective element, a reasonable juror could conclude that officials within the MDOC were deliberately indifferent to his condition. Dinkins was confined to a wheelchair, and so his condition was at least somewhat obvious to even a non-medical layperson such as a correctional officer. But even if officers did not know the full extent of his paralysis and weakness, Dinkins testified that he made several requests for accommodations, both written and

orally, to wardens, correctional officers, and medical staff. Dinkins' testimony was supported by numerous grievances filed by Dinkins and discussed in detail above – some of which were acknowledged by prison officials in grievance responses. A jury could reasonably conclude that officials knew the conditions Dinkins experienced while in administrative segregation without his wheelchair and failed to remedy those conditions.

Defendants argue they are entitled to immunity because Dinkins cannot demonstrate that prison officials were deliberately indifferent to a serious medical need and can show no more than disagreement with medical treatment decisions. Dinkins does allege indifference to a serious medical need, but he also alleged Eighth Amendment violations stemming from his living conditions. Defendants do not address why these living conditions could not form the factual basis for an Eighth Amendment violation claim. Defendants also argue that Dinkins did not allege any violations of the Eighth Amendment in his Second Amended Complaint, relying on Dinkins' statement in the Second Amended Complaint that he does not intend to seek remedies through a 42 U.S.C. § 1983 claim. While Dinkins does state he is not seeking a remedy through § 1983, Dinkins specifically alleges that through various refusals to accommodate his disability, MDOC violated the Eighth and Fourteenth Amendments. [Doc. 33-1, p. 16, ¶ 35; p. 21, ¶ 42]. And as discussed above, sufficient evidence exists so that a reasonable juror could conclude that a violation of those Amendments occurred.

Dinkins has provided sufficient evidence to create the inference that he was forced to crawl on the floor, eat his food on the floor, miss meals and showers, and sit in his own urine when his wheelchair was removed in administrative segregation. A reasonable juror could conclude that Defendants had notice of these conditions and failed to remedy these conditions by returning his wheelchair or providing some other reasonable accommodation. Because the

Defendants' conduct, if true, violates the Eighth and Fourteenth Amendments, Title II of the ADA abrogates Defendants' immunity under the Eleventh Amendment. Therefore, Defendants are not entitled to summary judgment on the basis of Eleventh Amendment immunity.

**IV.    Conclusion**

For the reasons set forth above, the State of Missouri and the Missouri Department of Corrections' Motion for Summary Judgment, [Doc. 197], is granted in part and denied in part. Defendants' Motion for Summary Judgment as to Dinkins' physical therapy claims is granted. Defendants' Motion for Summary Judgment as to Dinkins' housing and meal claims is denied.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: May 4, 2015
Jefferson City, Missouri

21